IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION

OMAR F. BARNES,
      Petitioner,

vs.                                Case No.:  3:09cv360/MCR/EMT

SECRETARY, FLA. DEP'T OF CORR.,
      Respondent.
_____/

## REPORT AND RECOMMENDATION

      This cause is before the court on Petitioner's petition for writ of habeas corpus filed under 28 U.S.C. § 2254 (doc. 1).  Respondent filed an answer and relevant portions of the state court record (doc. 22).  Petitioner filed a reply (doc. 28).

      The matter is referred to the undersigned magistrate judge for report and recommendation pursuant to 28 U.S.C. § 636 and N. D. Fla. Loc. R. 72.2(b).  After careful consideration of all issues raised by Petitioner, it is the opinion of the undersigned that no evidentiary hearing is required for the disposition of this matter, Rules Governing Section 2254 Cases 8(a).  It is further the opinion of the undersigned that the pleadings and attachments before the court show that Petitioner is not entitled to relief.

I.      BACKGROUND AND PROCEDURAL HISTORY

      The relevant aspects of the procedural background of this case are established by the state court record (*see* doc. 22).[1]  Petitioner was indicted in the Circuit Court in and for Escambia County, Florida, on one count of premeditated first degree murder with a firearm (Ex. A).  Following a jury trial on April 4–6, 2005, he was found guilty as charged (Exs. D,  E).  He was sentenced on April

_____

[1] Hereinafter all citations to the state court record refer to the exhibits submitted with Respondent's answer (doc. 22).  If a cited page has more than one page number, the court cites to the "Bates stamp" page number.

6, 2005, to a mandatory minimum term of life imprisonment, with presentence credit of one year and 143 days (Ex. F).

Petitioner, through counsel, appealed the judgment to the Florida First District Court of Appeal ("First DCA"), Case No. 1D05-2318 (Ex. K). The First DCA affirmed the judgment per curiam without written opinion on April 19, 2006, with the mandate issuing July 6, 2006 (Ex. N.). Barnes v. State, 931 So. 2d 903 (Fla. 1st DCA 2006) (Table). Petitioner did not seek further review.

On July 20, 2006, Petitioner filed a motion for post-conviction relief, pursuant to Rule 3.850 of the Florida Rules of Criminal Procedure (Ex. O). On August 14, 2006, he filed a motion to voluntarily dismiss his Rule 3.850 motion without prejudice (Ex. P). On September 5, 2006, the state circuit court granted Petitioner's motion to voluntarily dismiss the Rule 3.850 motion (Ex. Q).

On August 30, 2006, Petitioner filed a petition alleging ineffective assistance of appellate counsel in the First DCA, Case No. 1D06-4592 (Ex. II). The First DCA denied the petition on the merits on September 29, 2006 (Ex. JJ). The court denied Petitioner's motion for rehearing on November 15, 2006 (Ex. KK). Barnes v. State, 943 So. 2d 814 (Fla. 1st DCA 2006).

Also on August 30, 2006, Petitioner filed another Rule 3.850 motion in the state circuit court (Ex. S). He subsequently filed an "amended/second" motion adding new claims (Ex. T). On April 24, 2007, the state circuit court issued an order determining that the "amended/second" motion failed to contain a sufficient oath, as required by Florida law; therefore, the court held his first motion in abeyance and granted Petitioner thirty (30) days within which to file a legally sufficient amended motion (Ex. V). On April 28, 2007, Petitioner filed an "amended/second" Rule 3.850 motion (Ex. W). On June 13, 2007, the state circuit court dismissed the "amended/second" Rule 3.850 motion with prejudice, because it did not contain a legally sufficient oath (Ex. Z). The same day, the court rendered an order summarily denying Petitioner's August 30, 2006 motion, which had been held in abeyance until expiration of the 30-day period for Petitioner's filing a legally sufficient amended motion (Ex. Y). Petitioner appealed both decisions to the First DCA, Case No. 1D07-4283 (Exs. CC, DD). The First DCA affirmed both decisions per curiam without written opinion on December 7, 2007, with the mandate issuing February 20, 2008 (Ex. FF). Barnes v. State, 973 So. 2d 1126 (Fla. 1st DCA 2007) (Table). While the appeal was pending, Petitioner filed a motion to correct the

appellate record in the lower court (Ex. HH).  On April 3, 2008, after the appeal had concluded, the lower court denied the motion as moot (*id.*).

On September 8, 2007, Petitioner filed a third Rule 3.850 motion (Ex. LL).  On April 3, 2008, the state circuit court dismissed the motion as impermissibly successive (Ex. RR).  Petitioner appealed the decision to the First DCA, Case No. 1D08-3356 (Exs. TT, UU).  The First DCA affirmed the decision per curiam without written opinion on December 10, 2008, with the mandate issuing January 20, 2009 (Ex. WW).  Barnes v. State, 998 So. 2d 608 (Fla. 1st DCA 2008) (Table).

On July 3, 2008, Petitioner filed a fourth Rule 3.850 motion alleging newly discovered evidence (Ex. KK).  On January 2, 2009, the state circuit court dismissed the motion as impermissibly successive, finding that the information presented by Petitioner did not qualify as newly discovered evidence (Ex. ZZ).  Petitioner appealed the decision to the First DCA, Case No. 1D09-536 (Ex. BBB).  The First DCA affirmed the decision per curiam without written opinion on May 22, 2009, with the mandate issuing August 10, 2009 (Ex. CCC).  Barnes v. State, 13 So. 3d 58 (Fla. 1st DCA 2009) (Table).

Petitioner filed the instant federal habeas action on August 18, 2009 (doc. 1).  Respondent concedes the habeas petition is timely (doc. 22 at 8).

II.     STANDARD OF REVIEW

Section 2254(a) of Title 28 provides that "a district court shall entertain an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court" upon a showing that his custody is in violation of the Constitution or laws of the United States.  As the instant petition was filed after April 24, 1996, it is subject to the more deferential standard for habeas review of state court decisions under § 2254 as brought about by the Anti-Terrorism and Effective Death Penalty Act of 1996 (AEDPA).  Pub.L. 104-132, § 104, 110 Stat. 1214, 1218–19.  In relevant part, section 2254(d) now provides:

> (d)  An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim–
>
> > (1)  resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2)   resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C.A. § 2254 (2002).

The United States Supreme Court explained the framework for § 2254 review in <u>Williams v. Taylor</u>, 529 U.S. 362, 120 S. Ct. 1495, 146 L. Ed. 2d 389 (2000).[2]  The appropriate test was described by Justice O'Connor as follows:

> In sum, § 2254(d)(1) places a new constraint on the power of a federal habeas court to grant a state prisoner's application for a writ of habeas corpus with respect to claims adjudicated on the merits in state court.  Under § 2254(d)(1), the writ may issue only if one of the following two conditions is satisfied—the state court adjudication resulted in a decision that (1) "was contrary to . . . clearly established Federal law, as determined by the Supreme Court of the United States," or (2) "involved an unreasonable application of . . . clearly established Federal law, as determined by the Supreme Court of the United States."  Under the "contrary to" clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by this court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts.  Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.

<u>Id.</u>, 529 U.S. at 412–13 (O'Connor, J., concurring); <u>Ramdass v. Angelone</u>, 530 U.S. 156, 120 S. Ct. 2113, 2119–20, 147 L. Ed. 2d 125 (2000).  In employing this test, the Supreme Court has instructed that on any issue raised in a federal habeas petition upon which there has been an adjudication on the merits in a formal State court proceeding, the federal court should first ascertain the "clearly established Federal law," namely, "the governing legal principle or principles set forth by the Supreme Court at the time the state court render[ed] its decision."  <u>Lockyer v. Andrade</u>, 538 U.S. 63, 71–72, 123 S. Ct. 1166, 155 L. Ed. 2d 144 (2003).  The law is "clearly established" if Supreme Court precedent at the time "would have compelled a particular result in the case."  <u>Neelley v.</u>

---

[2] Unless otherwise noted, references to <u>Williams</u> are to the majority holding, written by Justice Stevens for the Court (joined by Justices O'Connor, Kennedy, Souter, Ginsburg, and Breyer) in parts I, III, and IV of the opinion (529 U.S. at 367–75, 390–99); and Justice O'Connor for the Court (joined by Justices Rehnquist, Kennedy, Thomas, and—except as to the footnote—Scalia) in part II (529 U.S. at 403–13).  The opinion of Justice Stevens in Part II was joined by Justices Souter, Ginsburg, and Breyer.

Nagle, 138 F.3d 917, 923 (11th Cir. 1998), *overruled on other grounds by* Parker v. Head, 244 F.3d 813, 835 (11th Cir. 2001).

Next, the court must determine whether the State court adjudication is contrary to the clearly established Supreme Court case law, either because "'the state court applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases' or because 'the state court confronts a set of facts that are materially indistinguishable from a decision of th[e] [Supreme] Court and nevertheless arrives at a result different from [Supreme Court] precedent.'" Lockyer, 538 U.S. at 73 (quoting Williams, 529 U.S. at 405–06). The Supreme Court has clarified that "[a]voiding these pitfalls does not require citation to our cases—indeed, it does not even require awareness of our cases, so long as neither the reasoning nor the result of the state-court decision contradicts them." Early v. Packer, 537 U.S. 3, 8, 123 S. Ct. 362, 365, 154 L. Ed. 2d 263 (2002) (quoting Williams, 529 U.S. at 405–06). If the State court decision is found in either respect to be contrary, the district court must independently consider the merits of the petitioner's claim.

If on the other hand, the State court applied the correct Supreme Court precedent and the facts of the Supreme Court cases and the petitioner's case are not materially indistinguishable, the court must go to the third step and determine whether the State court "unreasonably applied" the governing legal principles set forth in the Supreme Court's cases. The standard for an unreasonable application inquiry is "whether the state court's application of clearly established federal law was objectively unreasonable." Williams, 529 U.S. at 409. Whether a State court's decision was an unreasonable application of a legal principle must be assessed in light of the record the court had before it. Holland v. Jackson, 542 U.S. 649, 652, 124 S. Ct. 2736, 2737–38, 159 L. Ed. 2d 683 (2004) (per curiam); *cf.* Bell v. Cone, 535 U.S. 685, 697 n.4, 122 S. Ct. 1843, 1851 n.4, 152 L. Ed. 2d 914 (2002) (declining to consider evidence not presented to state court in determining whether its decision was contrary to federal law). An objectively unreasonable application of federal law occurs when the State court "identifies the correct legal rule from Supreme Court case law but unreasonably applies that rule to the facts of the petitioner's case" or "unreasonably extends, or unreasonably declines to extend, a legal principle from Supreme Court case law to a new context." Putman v. Head, 268 F.3d 1223, 1241 (11th Cir. 2001). "In determining whether a state court's decision represents an unreasonable application of clearly established federal law, a federal court

conducting habeas review 'may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly.  Rather, that application must also be unreasonable.'" Gill v. Mecusker, 633 F.3d 1272, 1287 (11th Cir. 2011) (quoting Williams, 529 U.S. at 411) (citing Harrington v. Richter, — U.S. —, 131 S. Ct. 770, 786–87 (Jan. 19, 2011)).  The AEDPA's "unreasonable application" standard focuses on the state court's ultimate conclusion, not the reasoning that led to it.  See Gill, supra at 1291 (citing Harrington, 131 S. Ct. at 786).   Under § 2254(d), a habeas court must determine what arguments or theories supported or could have supported the state court's decision, and then ask whether it is possible that fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of the Supreme Court. See Harrington, 131 S. Ct. at 786; see also Gill, supra, at 1292 (the federal district court may rely on grounds other than those articulated by the state court in determining that habeas relief was not warranted, so long as the district court did not err in concluding that the state court's rejection of the petitioner's claims was neither an unreasonable application of a Supreme Court holding nor an unreasonable determination of the facts).

Section 2254(d) also allows federal habeas relief for a claim adjudicated on the merits in State court where that adjudication "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d)(2).  The Supreme Court has clarified that: "a decision adjudicated on the merits in a state court and based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding." Miller-El v. Cockrell, 537 U.S. 322, 340, 123 S. Ct. 1029, 1041, 154 L. Ed. 2d 931 (2003) (dictum).

When performing its review under § 2254(d), the federal court must bear in mind that any "determination of a factual issue made by a State court shall be presumed to be correct," and the petitioner bears "the burden of rebutting the presumption of correctness by clear and convincing evidence."  28 U.S.C. § 2254(e)(1); see e.g. Miller-El, 537 U.S. at 340 (explaining that a federal court can disagree with a state court's factual finding and, when guided by AEDPA, "conclude the decision was unreasonable or that the factual premise was incorrect by clear and convincing evidence"); Jones v. Walker, 469 F.3d 1216, 1226–27 (11th Cir. 2007) (holding that § 2254(d)(2)'s

"unreasonable determination" standard "must be met by clear and convincing evidence," and concluding that that standard was satisfied where prisoner showed "clearly and convincingly" that the state court's decision "contain[ed] an 'unreasonable determination' of fact."). The "unreasonable determination of the facts" standard is only implicated to the extent that the validity of the state court's ultimate conclusion is premised on unreasonable fact finding. *See* Gill, 2010 WL 609844, at \*18. A petitioner is not entitled to relief unless he demonstrates by clear and convincing evidence that the record reflects an insufficient factual basis for affirming the state court's decision. *Id.*

Only if the federal habeas court finds that the petitioner satisfied AEDPA, and § 2254(d), does the court take the final step of conducting an independent review of the merits of the petitioner's claims. *See* Panetti v. Quarterman, 531 U.S. 930, 953, 127 S. Ct. 2842, 2858, 168 L. Ed. 2d 662 (2007); Jones, 469 F.3d 1216 (same). The writ will not issue unless the petitioner shows that he is in custody "in violation of the Constitution or laws and treaties of the United States." 28 U.S.C. § 2254(a).

III.   EXHAUSTION AND PROCEDURAL DEFAULT

It is a long-standing prerequisite to the filing of a federal habeas corpus petition that the petitioner have exhausted available state court remedies, 28 U.S.C. § 2254(b)(1),[3] thereby giving the State the "'opportunity to pass upon and correct' alleged violations of its prisoners' federal rights." Duncan v. Henry, 513 U.S. 364, 365, 115 S. Ct. 887, 888, 130 L. Ed. 2d 865 (1995) (quoting Picard v. Connor, 404 U.S. 270, 275, 92 S. Ct. 509, 30 L. Ed. 2d 438 (1971) (citation omitted)). To satisfy the exhaustion requirement, the petitioner must "fairly present" his claim in

---

[3]Section 2254 provides, in pertinent part:

(b)(1)   An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted unless it appears that–
          (A)  the applicant has exhausted the remedies available in the courts of the State; or
          (B) (i)  there is an absence of available State corrective process; or
              (ii)  circumstances exist that render such process ineffective to protect the rights of the applicant.
. . . .
(c) An applicant shall not be deemed to have exhausted the remedies available in the courts of the State, within the meaning of this section, if he has the right under the law of the State to raise, by any available procedure, the question presented.

each appropriate state court, alerting that court to the federal nature of the claim.  Duncan, 513 U.S. at 365–66; O'Sullivan v. Boerckel, 526 U.S. 838, 845, 119 S. Ct. 1728, 144 L. Ed. 2d 1 (1999); Picard, 404 U.S. at 277–78.

The Supreme Court has provided lower court with guidance for determining whether a habeas petitioner has met the "fair presentation" requirement.  In Picard v. Connor, the Court held that, for purposes of exhausting state remedies, a claim for relief in habeas corpus must include reference to a specific federal constitutional guarantee, as well as a statement of the facts which entitle the petitioner to relief.  404 U.S. at 277.  In announcing that "the substance of a federal habeas corpus claim must first be presented to the state courts," id., 404 U.S. at 278, the Court rejected the contention in that case that the petitioner satisfied the exhaustion requirement by presenting the state courts only with the facts necessary to state a claim for relief.

Additionally, the Court has indicated that it is not enough that a petitioner make a general appeal to a constitutional guarantee as broad as due process to present the "substance" of such a claim to a state court.  Anderson v. Harless, 459 U.S. 4, 103 S. Ct. 276, 74 L. Ed. 2d 3 (1982).  In Anderson, the habeas petitioner was granted relief by the Sixth Circuit Court of Appeals on the ground that a jury instruction violated due process because it obviated the requirement that the prosecutor prove all the elements of the crime beyond a reasonable doubt.  459 U.S. at 7 (citing Sandstrom v. Montana, 442 U.S. 510, 99 S. Ct. 2450, 61 L. Ed. 2d 39 (1979)).  The only manner in which the habeas petitioner cited federal authority was by referring to a state court decision in which "the defendant . . . asserted a broad federal due process right to jury instructions that properly explain state law."  Anderson, 459 U.S. at 7 (internal quotation marks omitted).  The Court expressed doubt that a defendant's citation to a state-court decision predicated solely on state law was sufficient to fairly apprise a reviewing court of a potential federal claim merely because the defendant in the cited case advanced a federal claim.  Id., 459 U.S. at 7 and n.3.  Furthermore, the Court clarified that such a citation was obviously insufficient when the record satisfied the federal habeas court that the federal claim asserted in the cited case was not the same as the federal claim on which federal habeas relief was sought.  Id.

Years later, the Supreme Court readdressed the "fair presentation" requirement in Duncan v. Henry, 513 U.S. 364.  The Duncan Court strictly construed the exhaustion requirement so as to

mandate that, if state and federal constitutional law overlap in their applicability to a petitioner's claim, the petitioner must raise his issue in terms of the applicable federal right in state court in order to obtain federal review of the issue.[4]  The Supreme Court explained, "[i]f a habeas petitioner wishes to claim that an evidentiary ruling at a state court trial denied him the due process of law guaranteed by the Fourteenth Amendment, he must say so, not only in federal, but in state court."  Duncan, 513 U.S. at 365–66.  More recently, the Supreme Court again focused upon the requirement of "fair presentation," holding that "ordinarily a state prisoner does not 'fairly present' a claim to a state court if that court must read beyond a petition or a brief (or a similar document) that does not alert it to the presence of a federal claim in order to find material, such as a lower court opinion in the case, that does so."  Baldwin v. Reese, 541 U.S. 27, 124 S. Ct. 1347, 1351, 158 L. Ed. 2d 64 (2004).  In Baldwin, the Supreme Court recognized that "[a] litigant wishing to raise a federal issue can easily indicate the federal law basis for his claim in a state-court petition or brief, for example, by citing in conjunction with the claim the federal source of law on which he relies or a case deciding such a claim on federal grounds, or by simply labeling the claim 'federal.'"  Id., 541 U.S. at 32.  This language, while not part of the Court's holding, provides helpful instruction.  With regard to this language, the Eleventh Circuit explained in McNair v. Campbell, 416 F.3d 1291 (11th Cir. 2005):

> If read in a vacuum, this dicta might be thought to create a low floor indeed for petitioners seeking to establish exhaustion.  However, we agree with the district court that this language must be "applied with common sense and in light of the purpose underlying the exhaustion requirement[:] 'to afford the state courts a meaningful opportunity to consider allegations of legal error without interference from the federal judiciary.'"  McNair [v. Campbell], 315 F. Supp. 2d at 1184 (quoting Vasquez v. Hillery, 474 U.S. 254, 257, 106 S. Ct. 617, 620, 88 L. Ed. 2d 598 (1986)).  This is consistent with settled law established by the Supreme Court. . . . We therefore hold that "'[t]he exhaustion doctrine requires a habeas applicant to do more than scatter some makeshift needles in the haystack of the state court record.'"

416 F.3d at 1302-03 (citations omitted).[5]

---

[4] The petitioner in Duncan raised a federal due process claim in his habeas petition, but had raised only a state constitutional claim in his state appeal.  Presented with a state constitutional claim, the state court applied state law in resolving the appeal.  513 U.S. at 366.

[5] In his initial brief before the Court of Criminal Appeals, McNair cited one federal case in a string citation containing other state cases, and in a closing paragraph in his argument that extraneous materials were considered by the jury during deliberations, stated that there was a violation of his rights "protected by the Fifth, Sixth, Eighth[,] and

The Eleventh Circuit, prior to <u>Duncan</u>, had broadly interpreted the "fair presentation" requirement.  After <u>Duncan</u>, however, the Eleventh Circuit has taken a more narrow approach.  For example, in <u>Zeigler v. Crosby</u>, the court held that the habeas petitioner failed to "fairly present" his juror misconduct claims to the state courts where his brief to the state appellate court did not refer to the federal constitutional issues raised in his federal habeas petition, and none of the cases cited in his direct appeal discussed the United States Constitution.  345 F.3d 1300, 1307 (11th Cir. 2003). The Eleventh Circuit specifically noted that the section of the petitioner's appellate brief which dealt with juror misconduct contained the words:  "Appellant was denied due process and a fair trial. . . .," which could be interpreted as asserting a fair trial claim under the Due Process Clause of the Florida Constitution.  <u>Id.</u> at 1308 n.5.  The only cases cited in the discussion of the issue in petitioner's state appellate brief were state supreme court cases that made no mention of the United States Constitution and cited no federal cases.  The court concluded that petitioner's "[c]ursory and conclusional sentence (unaccompanied by citations to federal law), . . . did not present to the Florida courts the federal claim asserted to us."  <u>Id.</u>

An issue that was not properly presented to the state court and which can no longer be litigated under state procedural rules is considered procedurally defaulted, that is, procedurally barred from federal review.  <i>See</i> <u>O'Sullivan</u>, 526 U.S. at 839–40, 848; <u>Bailey v. Nagle</u>, 172 F.3d 1299, 1302–03 (11th Cir. 1999).  This court will also consider a claim procedurally defaulted if it was presented in state court and rejected on the independent and adequate state ground of procedural bar or default.  <i>See</i> <u>Coleman v. Thompson</u>, 501 U.S. 722, 734–35 and n.1, 111 S. Ct. 2546, 2555 and n.1, 115 L. Ed. 2d 640 (1991); <u>Caniff v. Moore</u>, 269 F.3d 1245, 1247 (11th Cir. 2001) ("[C]laims that have been held to be procedurally defaulted under state law cannot be addressed by federal courts."); <u>Chambers v. Thompson</u>, 150 F.3d 1324, 1326–27 (11th Cir. 1998) (applicable state procedural bar should be enforced by federal court even as to a claim which has never been presented to a state court); <i>accord</i> <u>Tower v. Phillips</u>, 7 F.3d 206, 210 (11th Cir. 1993); <u>Parker v.</u>

---

Fourteenth Amendments to the United States Constitution, the Alabama Constitution[,] and Alabama law." <u>McNair v. Campbell</u>, 416 F.3d 1291, 1303 (11th Cir. 2005).  The court found that these references to federal law were not sufficient to meet the fair presentment requirement and noted that it was important that the petitioner had never mentioned the federal standards regarding extraneous materials in his brief, but relied on state law for his arguments.  <i>Id.</i>

Dugger, 876 F.2d 1470 (11th Cir. 1990), *rev'd on other grounds*, 498 U.S. 308, 111 S. Ct. 731, 112 L. Ed. 2d 812 (1991).  In the first instance, the federal court must determine whether any future attempt to exhaust state remedies would be futile under the state's procedural default doctrine. Bailey, 172 F.3d at 1303.  In the second instance, a federal court must determine whether the state's procedural default ruling rested on adequate state grounds independent of the federal question.  *See* Harris v. Reed, 489 U.S. 255, 109 S. Ct. 1038, 1043, 103 L. Ed. 2d 308 (1989).  The adequacy of a state procedural bar to the assertion of a federal question is itself a federal question.  Lee v. Kemna, 534 U.S. 362, 122 S. Ct. 877, 885, 151 L. Ed. 2d 820 (2002).  The adequacy requirement has been interpreted to mean that the rule must be "firmly established and regularly followed," Siebert v. Allen, 455 F.3d 1269, 1271 (11th Cir. 2006), that is, not applied in an "arbitrary or unprecedented fashion," Judd v. Haley, 250 F.3d 1308,1313 (11th Cir. 2001), or in a manifestly unfair manner.  Ford v. Georgia, 498 U.S. 411, 424–25, 111 S. Ct. 850, 858, 112 L. Ed. 2d 935 (1991); Upshaw v. Singletary, 70 F.3d 576, 579 (11th Cir. 1995).

The Eleventh Circuit has set forth a three-part test to determine whether a state court's procedural ruling constitutes an independent and adequate state rule of decision.  Judd v. Haley, 250 F.3d 1308, 1313 (11th Cir. 2001).  First, the last state court rendering judgment must clearly and expressly state it is relying on state procedural rules to resolve the federal claim.[6]  Second, the state court's decision on the procedural issue must rest entirely on state law grounds and not be intertwined with an interpretation of federal law.  Third, the state procedural rule must be adequate. *Id.*  The adequacy requirement has been interpreted to mean the rule must be firmly established and regularly followed, that is, not applied in an arbitrary or unprecedented fashion.  *Id.*

To overcome a procedural default such that the federal habeas court may consider the merits of a claim, the petitioner must show cause and prejudice or a fundamental miscarriage of justice. Tower, 7 F.3d at 210; Parker, 876 F.2d 1470.  "For cause to exist, an external impediment, whether it be governmental interference or the reasonable unavailability of the factual basis for the claim, must have prevented petitioner from raising the claim."  McCleskey v. Zant, 499 U.S. 467, 497, 111

---

[6] The federal court should honor the procedural bar even if the state court alternatively reviewed the claim on the merits.  Marek v. Singletary, 62 F.3d 1295, 1302 (11th Cir. 1995); Alderman v. Zant, 22 F.3d 1541 (11th Cir. 1994).

S. Ct. 1454, 1472, 113 L. Ed. 2d 517 (1991) (quoting <u>Murray v. Carrier</u>, 477 U.S. 478, 488, 106 S.

Ct. 2639, 2645, 91 L. Ed. 2d 397 (1986)).  Lack of counsel or ignorance of available procedures is

not enough to establish cause.  <u>Tower</u>, 7 F.3d at 210.  To satisfy the miscarriage of justice exception,

the petitioner must show that "a constitutional violation has probably resulted in the conviction of

one who is actually innocent."  <u>Schlup v. Delo</u>, 513 U.S. 298, 327, 115 S. Ct. 85, 130 L. Ed. 2d 808

(1995).  "To establish the requisite probability, the petitioner must show that it is more likely than

not that no reasonable juror would have convicted him."  <u>Schlup</u>, 513 U.S. at 327.  Further:

> a substantial claim that constitutional error has caused the conviction of an innocent
> person is extremely rare.  To be credible, such a claim requires [a] petitioner to
> support his allegations of constitutional error with new reliable evidence -- whether
> it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical
> physical evidence -- that was not presented at trial.

*Id.*

Within this framework, the court will review Petitioner's claims.

IV.    PETITIONER'S CLAIMS[7]

A.    <u>Ground Two:  "Violation of Petitioner's Sixth Amendment right to the effective
assistance of counsel where counsel failed to conduct adequate pretrial investigation and
move the trial court for a suppression of Petitioner's alleged confession made in violation
of Miranda."</u>

Petitioner contends defense counsel performed ineffectively by failing to investigate whether

grounds existed to seek suppression of Petitioner's statements to Detective Goss on November 7,

2003, and failing to file a motion to suppress the statements (doc. 1 at 7).[8]  Petitioner states that on

November 7, 2003, he signed a written waiver of his <u>Miranda</u>[9] rights and was interrogated by

Sergeant Trotter with the Cumberland Sheriff's Office in North Carolina (*see id.* at 6–7).  He states

Detective Goss, from the Pensacola Police Department, observed him waive his rights via closed

circuit television (*id.* at 6).  Petitioner states after he was interrogated by Sergeant Trotter, Trotter

"took a break" to take a telephone call regarding Petitioner's extradition (*id.*).  Trotter then returned

---

[7] The court is addressing Petitioner's claims out of sequence for organizational purposes.

[8] The page references used in this Report reflect the page numbers as enumerated in the court's electronic docketing system rather than those the parties may have assigned.

[9] <u>Miranda v. Arizona</u>, 384 U.S. 436, 86 S. Ct. 1602, L. Ed. 2d 694 (1966).

to the interrogation room with Detective Goss and Investigator Sanderson, introduced Petitioner to them, and left the room (*id.*).  Petitioner states Goss "took over" the interrogation without re-advising him of his Miranda rights (*id.*).  Petitioner contends if counsel had investigated this issue, counsel would have discovered that Petitioner's statements to Detective Goss were obtained in violation of Miranda, due to Goss's failure to re-advise him of his rights (*id.* at 7).

Petitioner argues the state post-conviction court's denial of his claim was contrary to Strickland v. Washington, 466 U.S. 668 (1984), because the court applied a higher prejudice standard than Strickland requires, as evidenced by the court's statement that he "cannot demonstrate that the motion to suppress would have been granted" (*id.*).  Petitioner additionally argues the state court's denial of the claim was based upon an unreasonable determination of the facts, namely, its finding the November 7, 2003 interrogation was "a single continuing session . . . without a break." Petitioner argues this finding is refuted by Sergeant Trotter's Case Supplemental Report, which states Detective Goss was not present during Trotter's interrogation of Petitioner, and there was a "significant break" between Trotter's interrogation and Goss's interrogation (*id.*).

Respondent concedes this ineffective assistance of counsel claim was fairly presented and adjudicated in Petitioner's Rule 3.850 motion filed August 30, 2006 (doc. 22 at 22–25).  However, Respondent contends Petitioner did not argue on post-conviction appeal that the lower court applied the wrong prejudice standard; therefore, that aspect of his present argument was not exhausted (doc. 22 at 27–28).  Respondent additionally argues that notwithstanding the exhaustion issue, Petitioner failed to demonstrate he is entitled to federal habeas relief on his claim (*id.* at 29–35).

Upon review of the state court record, the undersigned concludes Petitioner satisfied the exhaustion requirement with regard to this claim.  Therefore, the court will proceed to determine whether Petitioner demonstrated he is entitled to relief under the AEDPA.

1.      Clearly Established Federal Law

The standard for evaluating claims of ineffective assistance of counsel is set forth in Strickland v. Washington, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984).  To obtain relief under Strickland, Petitioner must show (1) deficient performance by counsel and (2) a reasonable probability that, but for counsel's deficient performance, the result of the proceeding would have

been different.  466 U.S. at 687–88.  If Petitioner fails to make a showing as to either performance or prejudice, he is not entitled to relief.  *Id.* at 697.

"The petitioner's burden to prove, by a preponderance of the evidence, that counsel's performance was unreasonable is a heavy one."  Jones v. Campbell, 436 F.3d 1285, 1293 (11th Cir. 2006) (citing Chandler v. United States, 218 F.3d 1305, 1313 (11th Cir. 2000) (en banc)).  The focus of inquiry under the performance prong is "reasonableness under prevailing professional norms."  Strickland, 466 U.S. at 688–89.  "Judicial scrutiny of counsel's performance must be highly deferential," and courts should make every effort to "eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time."  *Id.* at 689.  If the record is not complete regarding counsel's actions, "then the courts should presume 'that what the particular defense lawyer did at trial—for example, what witnesses he presented or did not present—were acts that some lawyer might do."  Jones, 436 F.3d at 1293 (citing Chandler, 218 F.3d at 1314–15 n.15).  Furthermore, "[e]ven if many reasonable lawyers would not have done as defense counsel did at trial, no relief can be granted on ineffectiveness grounds unless it is shown that no reasonable lawyer, in the circumstances, would have done so."  Rogers v. Zant, 13 F.3d 384, 386 (11th Cir. 1994).  Counsel's performance is deficient only if it is "outside the wide range of professional competence."  Jones, 436 F.3d at 1293 (citing Strickland, 466 U.S. at 690); Lancaster v. Newsome, 880 F.2d 362, 375 (11th Cir. 1989) (emphasizing that petitioner was "not entitled to error-free representation").  "[T]here are no 'absolute rules' dictating what reasonable performance is . . . ."  Michael v. Crosby, 430 F.3d 1310, 1320 (11th Cir. 2005) (quoting Chandler, 218 F.3d at 1317).  Indeed, "'[a]bsolute rules would interfere with counsel's independence—which is also constitutionally protected—and would restrict the wide latitude counsel have in making tactical decisions.'"  *Id.* (quoting Putman v. Head, 268 F.3d 1223, 1244 (11th Cir. 2001)).  "Complaints of uncalled witnesses are not favored, because the presentation of testimonial evidence is a matter of trial strategy and because allegations of what a

witness would have testified are largely speculative." Buckelew v. United States, 575 F.2d 515, 521 (5th Cir. 1978).[10]

As to the prejudice prong of the Strickland standard, Petitioner's burden of demonstrating prejudice is high. See Wellington v. Moore, 314 F.3d 1256, 1260 (11th Cir. 2002). The Supreme Court has cautioned that "'[i]t is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding.'" Id. (quoting Strickland, 466 U.S. at 693). However, the Court has also clarified that a petitioner need not demonstrate it "more likely than not, or prove by a preponderance of evidence," that counsel's errors affected the outcome. Strickland, 466 U.S. at 693–94. Instead,

> The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.

Id. at 694. Indeed, it would be "contrary to" the law clearly established in Strickland for a state court to reject an ineffectiveness claim for failing to prove prejudice by a preponderance of the evidence. Williams v. Taylor, 529 U.S. at 405–06.

The prejudice assessment does "not depend on the idiosyncracies of the particular decisionmaker," as the court should presume that the judge or jury acted according to law. Strickland, 466 U.S. at 694–95. "When a defendant challenges a conviction, the question is whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt." Id. at 695. Further, when the claimed error of counsel occurred at the guilt stage of trial (instead of on appeal), Strickland prejudice is gauged against the outcome of the trial, not on appeal. See Purvis v. Crosby, 451 F.3d 734, 739 (11th Cir. 2006) (citing Strickland, 466 U.S. at 694–95).

  2.  Federal Review of State Court Decision

---

[10] In Bonner v. City of Prichard, 661 F.2d 1206 (11th Cir. 1981) (en banc), the Eleventh Circuit adopted as binding precedent all former Fifth Circuit decisions rendered before October 1, 1981.

Petitioner raised this claim as Ground 1 in his Rule 3.850 motion filed August 30, 2006 (Ex. S at 64, 69–75).  The state circuit court correctly articulated the two-pronged Strickland standard as the applicable legal standard (Ex. Y).  The court adjudicated Petitioner's claim as follows:

> In his first claim, Defendant alleges his counsel performed deficiently by failing to file a motion to suppress the statements he made to police.  Defendant claims that the officer who first spoke to him after his arrest in North Carolina, Sergeant Trotter, ignored his original request to speak to counsel.  Defendant also claims that when he again agreed to speak to Sergeant Trotter a few days later that he was only agreeing to speaking with Sergeant Trotter and not to the Pensacola Police Department (PPD) officers, and that anything said to the PPD officers violated Defendant's Miranda rights.  Defendant claims that the introduction of his statements at trial was prejudicial because "without [his] statements there was only a suspicion of guilt."
>
> Defendant has failed to show prejudice in several respects.  First, Defendant cannot demonstrate that the motion would have been granted, even had counsel filed a motion to suppress his statements.  At the trial, the State did not offer any of the statements Defendant made the day of his original arrest in North Carolina on November 5.[FN3]  Even had Defendant's counsel been able to prove that Defendant asked for counsel when he was originally apprehended, it would not have changed the evidence introduced at trial because none of Defendant's statements from November 5 were used.
>
> > [FN3]   See Attachment 3, Trial Transcript, p. 173; see also Attachment 4, Deposition of Larry Trotter, pp. 10–14.
>
> Further, substantial evidence exists to support the fact that Defendant knowingly and voluntarily spoke with law enforcement.  First, Defendant attaches to his motion copies of two separate rights forms that he signed and initialed.[FN4]  These two rights forms were signed on November 5th and 7th, two separate occasions.  Additionally, Sergeant Trotter testified under oath at trial that Defendant was aware of his rights and waived those rights.[FN5]  Further, the Court assumes that Sergeant Trotter would have testified at trial in a manner consistent with his sworn deposition testimony, in which he states that Defendant never asked for an attorney because "if [defendant] did that, I would have stopped the interview."[FN6]  Further, it can also be assumed that had Detective Goss been asked on the stand about whether Defendant waived his rights, he would have testified consistently with his sworn deposition, in which he states that he observed Defendant waiving his rights.[FN7]   Defendant cannot therefore show that a motion to suppress the November 7 statements he made to police would have been granted, and therefore, he cannot prove prejudice from his attorney's failure to file a motion to suppress.

[FN4] <u>See</u> Defendant's Motion.

[FN5] <u>See</u> Attachment 4, Trial Transcript, pp. 167–68.

[FN6] <u>See</u> Attachment 5, Deposition of Sergeant Trotter, p.12.

[FN7] <u>See</u> Attachment 6, Deposition of Detective Erik Goss, pp. 16–18.  It also appears from reading Detective Goss's deposition that there is a videotape showing Defendant waiving his rights.

Furthermore, Defendant's argument that he only agreed to speak with Sergeant Trotter and not to the PPD officers would not have caused Defendant's November 7 statements to be suppressed.  "<u>Miranda</u> merely requires that the defendant be apprised of his rights and there must be a valid waiver of those rights before an interrogation can take place.  Nowhere is there a requirement that after effective waiver, each individual questioning the defendant during a single continuing session of interrogation must, prior to asking any questions, readvise the defendant of his <u>Miranda</u> rights."  <u>Enriquez v. State</u>, 449 So. 2d 845, 848 (Fla. 3d DCA 1984).  The trial testimony reveals that the PPD began to question Defendant immediately after he was questioned by Sergeant Trotter, without a break in interrogation.[FN8]  Therefore, there was no <u>Miranda</u> violation because Defendant had already been advised of his rights, and consequently, no basis to grant a suppression motion.   Because Defendant has failed to show either deficient performance on the part of counsel or prejudice, his first claim for relief must fail.

[FN8] <u>See</u> Attachment 7, Trial Transcript, pp.171–172.

(Ex. Y).

Initially, the undersigned rejects Petitioner's claim that the state court applied a higher prejudice standard than <u>Strickland</u>.  The state court expressly described the prejudice prong as "a reasonable probability that the outcome of the proceeding would have been different," and "a reasonable probability that, but for [counsel's] deficiency, the result of the proceeding would have been different." (*id.* (citing <u>Strickland</u>)).  The state court defined "reasonable probability" as "a probability sufficient to undermine confidence in the outcome" (*id.* (citing <u>Spencer v. State</u>, 842 So. 2d 52, 61 (Fla. 2003)).  This is the correct definition of <u>Strickland</u> prejudice.  *See* <u>Strickland</u>, 466 U.S. at 694.

Additionally, Petitioner failed to demonstrate by clear and convincing evidence that the state court's factual finding, that Detective Goss began to question Petitioner immediately after he was

questioned by Sergeant Trotter without a break in the interrogation, was unreasonable.  The state circuit court's finding was based upon the trial testimony.  At trial, Sergeant Trotter testified that as he was interviewing Petitioner, Detective Goss and Investigator Sanderson arrived and entered the room (Ex. D at 171–72).  He testified he introduced them to Petitioner, they "took over" the interview, and he departed (*id.* at 172).  Detective Goss testified that when he and Investigator Sanderson arrived at the sheriff's department in North Carolina, Petitioner was being interviewed by Trotter (*id.* at 186).  He testified he and Sanderson entered the room, and Trotter introduced the two of them to Petitioner (*id.*).  He stated they took over the interview, and Trotter left the room (*id.*).  Even though Sergeant Trotter's testimony was somewhat inconsistent with the statements in his Case Supplemental Report,[11] the state court's reliance upon his sworn trial testimony, instead of the unsworn statements in his report, was not unreasonable.  Further, even if a break occurred as described in Trotter's report, the description of the break does not clearly and convincingly rebut the state court's finding that Detective Goss began to question Petitioner immediately after he was questioned by Trotter.

Moreover, even if there was a break in the interrogation, Petitioner's statements to Goss were not obtained in violation of Miranda.  The Eleventh Circuit has held that where a defendant was fully advised of his Miranda rights and waived them, he does not need to be given Miranda warnings prior to a subsequent interrogation conducted the same day if, given the totality of the circumstances, the waiver was knowing, intelligent, and voluntary.  *See* Ballard v. Johnson, 821 F.2d 568, 571–72 (11th Cir. 1987) (where defendant properly executed waiver of Miranda rights during first

---

[11] In his report, Trotter states the following with regard to the interrogation on November 7, 2003:

I went to the detention center and asked BARNES if I could re-interview him, and explained that there was audio problems with the interview I taped [on November 5, 2003].  At 1020 hrs. I informed Omar BARNES of his rights.  BARNES waived his rights, a second time and agreed to talk to me with out [sic] a lawyer present.  GOSS and SANDERSON observed the interview until we took a break.  During the break I was notified that BARNES was needed at the courthouse for his extradition hearing.  Within one minute of that phone call I was called back and informed that the hearing was postponed until Monday, November 10, 2003.  I took Det. GOSS and Inv. SANDERSON into the interview room and introduced them to BARNES.  I exited the room, GOSS and SANDERSON continued the interview.

(Ex. S at 81).

interrogation, and subsequent interrogation occurred later on the same day, with the only break in questioning occurring when defendant was transported approximately twenty miles from one location to another, no violation of Miranda occurred by officer's failure to re-advise defendant of Miranda rights prior to subsequent interrogation); Jarrell v. Balkcom, 735 F.2d 1242, 1254 (11th Cir. 1984) (no violation of defendant's rights by failure to re-issue Miranda warnings at time of defendant's arrest, where Investigator Bishop gave defendant Miranda warnings at city hall prior to arrest; defendant indicated he understood Miranda warnings; defendant was transported from city hall to police headquarters, where he was interviewed by Sergeant Blannott; prior to Blannott's interview, Blannott asked Bishop in defendant's presence whether defendant had received Miranda warnings; defendant was driven from police headquarters to prosecutor's office for polygraph examination; defendant was then driven back to police headquarters and arrested by Sergeant Blannott; and defendant was interrogated for 30–45 minutes by Blannott before confessing); *see also* Martin v. Wainwright, 770 F.2d 918, 930–31 (11th Cir. 1985), *modified in unrelated part*, 781 F.2d 185 (11th Cir. 1986) (suspect who was fully advised of Miranda rights and intelligently waived them, did not need to be given the complete Miranda warnings prior to a subsequent interrogation conducted seven days later).

In the instant case, Petitioner does not dispute that Sergeant Trotter advised him of his rights prior to interviewing him on November 7, 2003; nor does he dispute he knowingly and voluntarily waived his rights and executed a written waiver. Petitioner also does not dispute that Detective Goss's interview was conducted the same day as Trotter's; indeed, it appears it was within minutes. In such circumstances, Goss was not required to re-advise Petitioner of his rights. Further, there is no allegation, or evidence suggesting, that Petitioner requested a lawyer at any time that day, or asked that either interview be terminated. Therefore, Petitioner failed to show that defense counsel's failure to investigate or seek suppression of Petitioner's statements to Detective Goss was unreasonable. He likewise failed to show a reasonable probability that the trial court would have properly granted a motion to suppress had counsel made one. The state court's adjudication of Petitioner's claim was therefore not contrary to or an unreasonable application of Strickland.

>    B.   Ground One: "Violation of Petitioner's Fifth Amendment right to the protection against self-incrimination when Petitioner's alleged confession, made in violation of Miranda, was used as evidence against Petitioner."

Petitioner contends constitutional error occurred by the admission of his statements to Detective Goss (doc. 1 at 6).  He argues the statements were obtained in violation of <u>Miranda</u>, because Goss failed to re-advise him of his <u>Miranda</u> rights when Goss commenced his interrogation (*id.*).  Petitioner  asserts the same facts underlying Ground Two, *supra*.

Respondent asserts Petitioner raised this claim as Ground 2 of his Rule 3.850 motion filed August 30, 2006, in conjunction with the related claim of ineffective assistance of counsel based upon counsel's failure to seek suppression of Petitioner's statements on the same grounds (doc. 22 at 12).  Respondent asserts the state circuit court addressed the separate but related claims by first analyzing the merits of Petitioner's ineffective assistance of counsel claim, and then stating that to the extent Petitioner raised a claim of trial court error in admitting the statements, the claim was procedurally barred (*id.* at 12–15).  Respondent argues Petitioner acknowledged on appeal that the lower court applied a procedural bar (*id.* at 15–16).  Respondent argues the First DCA affirmed the procedural bar; therefore, the claim is procedurally defaulted for purposes of federal habeas (*id.* at 15–18).

In Petitioner's reply, he contends the claim is not procedurally barred because the state circuit court denied it on the merits as well as on procedural grounds (doc. 28 at 6–9).  He also argues he could not have raised this claim on direct appeal of his conviction, because he was represented by counsel, and counsel failed to raise issues that Petitioner requested he raise (*id.* at 12).

2.      Federal Review of State Court Decision

The state court record demonstrates that Petitioner raised this claim as Ground 2 in his Rule 3.850 motion filed August 30, 2006 (Ex. S at 64, 69–75).  The state circuit court disposed of the claim as follows:

> Defendant next claims that his conviction is fundamentally unfair because it was based in large part on his confession.  The Court has found no merit in Defendant's first claim that his counsel was ineffective for failing to file a motion to suppress his statements; therefore, his second claim must also fail.  Additionally, to the extent that Defendant is raising a claim of trial court error or sufficiency of the evidence, such claims are appropriately raised on direct appeal. <u>See</u> <u>Boehm v. State</u>, 776 So. 2d 332 (Fla. 4th DCA 2001); <u>see</u> <u>also</u> Fla. R. Crim. P. 3.850(c).  Whether the statements were improperly admitted or the facts were sufficient to support

> Defendant's conviction are issues appropriately raised on direct appeal.  Therefore,
> Defendant is not entitled to relief as to his second claim.

(Ex. Y).

As previously noted, "[w]hen a state court addresses both the independent state procedural ground and the merits of the federal constitutional claim, the federal court should apply the state procedural bar and decline to reach the merits of the claim."  Marek, 62 F.3d at 1301; Alderman, 22 F.3d at 1549 ("However, as here, where a state court has ruled in the alternative, addressing both the independent state procedural ground and the merits of the federal claim, the federal court should apply the state procedural bar and decline to reach the merits of the claim.").  In this case, the state circuit applied the firmly established and regularly followed state procedural rule that a claim of trial court error in admitting a defendant's confession to law enforcement is properly raised on direct appeal.  See Boehm, 776 So. 2d 332; Fla. R. Crim. P. 3.850(c).  Further, Petitioner cannot now return to state court to properly exhaust this claim, because a second direct appeal in not available.  Therefore, the claim is procedurally barred from federal review.

Moreover, Petitioner failed to show that his statements to Detective Goss were obtained in violation of Miranda, as discussed *supra*.  Therefore, he failed to demonstrate he is entitled to federal habeas relief on his claim that admission of his statements to Goss violated his Fifth Amendment rights.

C.    Ground Three:  "Violation of Petitioner's Sixth Amendment right to the effective assistance of counsel where counsel failed to object to the prosecutor's improper and unsupported accusations during closing argument."

Ground Four:  "Violation of Petitioner's Sixth Amendment right to the effective assistance of counsel where counsel failed to move to have evidence suppressed that was obtained in violation of Petitioner's Fourth Amendment protection against unreasonable searches and seizures."

Ground Five:  "Violation of Petitioner's Fourth Amendment protection against unreasonable searches and seizures."

Ground Six:  "Violation of Petitioner's Sixth and Fourteenth Amendment right to a fair trial where Petitioner was forced to stand trial on perjured, material testimony."

Petitioner contends he raised each of these claims in a Rule 3.850 motion (doc. 1 at 8–11). Respondent contends that although Petitioner raised all of these claims in his "Amended/Second Motion for Post-conviction Relief Under Fla. R. Crim. Proc. Rule 3.850" (Ex. W) and/or his "Third Motion for Postconviction Relief Pursuant to Fla. R. Crim. P. Rule 3.850(a)(1)(6)" (Ex. LL), all of the claims asserted in those motions were rejected on an independent and adequate state ground of procedural bar or default (doc. 22 at 35–53).  Respondent contends the "Amended/Second" Rule 3.850 motion (Ex. W) was dismissed by the state circuit court on the ground that it failed to contain a legally sufficient oath, as required by Rule 3.850(c), even though the court had previously provided Petitioner an opportunity to correct the deficiency (Ex. Z).  Respondent contends the "Third" Rule 3.850 motion was dismissed by the state circuit court on the ground that it was impermissibly successive, pursuant to Rule 3.850(f) (Ex. RR).  Additionally, on Petitioner's appeal of the state circuit court's decisions, the First DCA affirmed the lower court's application of the respective procedural bars (Exs. FF, WW).  Therefore, the claims are procedurally barred from review on federal habeas.

The rule requiring Rule 3.850 motions to be filed under oath is firmly established and regularly followed by the Florida court.  *See* Rule 3.800(c); Smith v. State, 445 So. 2d 323, 326 (Fla. 1983) (trial court was procedurally precluded from addressing issue presented in an unsworn 3.850 motion); Sugar v. State, 655 So. 2d 1271 (Fla. 1st DCA 1995) (Rule 3.850 motion that is not properly verified under oath is legally insufficient); Widmer v. State, 641 So. 2d 174 (Fla. 1st DCA 1994) (unsworn 3.850 postconviction motion is facially insufficient).  Moreover, the state court applied a firmly established and regularly followed prohibition against successive Rule 3.850 motions in dismissing Petitioner's "Third" Rule 3.850 motion.  *See* Rule 3.800(f); Christopher v. State, 489 So .2d 22, 24 (Fla. 1986); Scott v. State, 656 So. 2d 204 (Fla. 5th DCA 1995).  Therefore, Petitioner is not entitled to federal review of Grounds Three, Four, Five, and Six unless he satisfies the "cause and prejudice" exception to the procedural bar or demonstrates that another exception applies.

In Petitioner's reply, he concedes Grounds Three, Four, Five, and Six were procedurally defaulted in the state courts (doc. 28 at 17–23).  As cause for his failure to comply with the oath requirement of Rule 3.850(c), which was the basis of the state court's dismissal of his

"Amended/Second" Rule 3.850 motion, Petitioner states he did not know that the page containing his oath was missing from the motion (doc. 28 at 19).  He states that upon his discovery that the page was missing, he filed a motion to correct the appellate record in the state circuit court, pursuant to Rule 9.200(f) of the Florida Rules of Appellate Procedure (*id.* at 19–20).  He asserts the state circuit court ignored the motion for months, and then denied it as moot after his appeal concluded (*id.* at 19–20).  Petitioner contends this denied him due process, because Rule 9.200(f)(2) provides, "If the court finds the record is incomplete, it shall direct a party to supply the omitted parts of the record. No proceeding shall be determined because the record is incomplete until an opportunity to supplement the record has been given."  With regard to Petitioner's "Third" Rule 3.850 motion, Petitioner contends it was not successive because his "Amended/Second" motion did not adjudicate the merits of his claims (*id.* at 20).

The state court record shows that on August 30, 2006, Petitioner filed an "Amended" motion for post-conviction relief, asserting the two claims discussed *supra* in Grounds One and Two (Ex. S).  On March 29, 2007, Petitioner filed an "Amended/Second" Rule 3.850 motion, raising four additional claims for relief (Ex. T). On April 24, 2007, the state circuit court issued an order finding that Petitioner's "Amended/Second" motion did not contain a legally sufficient oath; therefore, the court could not consider the merits of the claims asserted in the amendment (Ex. V).  The court found that Petitioner's August 30 motion contained a legally sufficient oath, but because all post-conviction claims needed to be considered together, the court held that motion in abeyance while Petitioner was granted thirty days to correct the defective oath in his "Amended/Second" motion by filing an amended "Amended/Second" motion (*id.*).  The court advised Petitioner that if he failed to file a legally sufficient "Amended/Second" motion by the deadline, the court may deny his motion with prejudice (*id.*).

On April 28, 2007, Petitioner filed an "Amended/Second" Rule 3.850 motion (Ex. W).  The same day, he filed a two-page "Motion to Accept Oath" in which he stated, in relevant part:

> WHEREFORE defendant/petitioner submits oath in support of "Amended/Second Motion for Post-conviction Relief" to be attached and considered with the filed motion for post-conviction relief, filed April 2, 2007 [the date the clerk of court received the March 29, 2007 "Amended/Second" motion].

(Ex. X). Both of these documents are included in the state court record, and neither contains an oath (*id.*). On June 13, 2007, the state circuit court dismissed Petitioner's amendment with prejudice on the ground that Petitioner failed to re-file the amendment with a legally sufficient oath (Ex. Z). In a separate order issued the same day, the state circuit court denied Petitioner's "Amended" motion, asserting Grounds One and Two *supra*, on the merits (Ex. Y). Petitioner filed a motion for rehearing on June 27, 2007, asserting he had attached an oath on page 10 of his "Amended/Second" motion filed April 28, 2007 (Ex. BB at 352). The state circuit court denied the motion for rehearing (*id.* at 357).

Petitioner appealed the orders denying his Rule 3.850 motions (Ex. CC). The record on appeal was transmitted August 16, 2007 (*see* Ex. GG). On August 22, 2007, Petitioner filed a Motion to Correct Record, pursuant to Rule 9.200(e)(f) of the Florida Rules of Appellate Procedure, in the state circuit court (Ex. DD). Although Petitioner's certificate of service states the motion was filed in the First DCA as well as the state circuit court (*see* Ex. HH), the First DCA's docket does not reflect filing of the motion in that court (*see* Ex. GG). In the motion, Petitioner alleged he mailed page 10 of his "Amended/Second" motion on April 28, 2007, but the clerk of court did not file it until May 7, 2007, which "[left] room for such an error as misplacing/losing/destroying a vital page" (Ex. HH). In support of his allegation that the clerk of court lost page 10, Petitioner submitted a Copying Service Request and Withdrawal from his correctional institution, showing he requested copies of a ten-page "Amended/Second 3.850" on April 27, 2007, and his request was approved on April 28, 2007 (*id.*). The state circuit court denied the Rule 9.200 motion on two grounds (*id.* at 193–95). First, the motion was moot because Petitioner's appeal concluded by the time the state circuit court ruled on the motion (*id.* at 194). Second, Petitioner's documentation did not establish that the "Amended/Second" motion was ten pages in length when mailed from the institution (*id.*).

Rule 9.200(f) provides:

(f) Correcting and Supplementing Record.

(1) If there is an error or omission in the record, the parties by stipulation, the lower tribunal <u>before the record is transmitted</u>, or the court may correct the record.

(2) If the court finds the record is incomplete, it shall direct a party to supply the omitted parts of the record.  No proceeding shall be determined, because of an incomplete record, until an opportunity to supplement the record has been given.

Fla. R. App. P. 9.200(f) (emphasis added).

In the instant case, Petitioner filed the motion to correct the record in the lower court <u>after</u> the record was transmitted to the appellate court.  Further, he did not file the motion in the appellate court.  Therefore, his contention that the state courts improperly determined the appeal prior to providing him an opportunity to supplement the record is without merit.  *See* <u>Trans-Continental Finance Corp. v. Baxter</u>, 402 So. 2d 1287, 1290 n.1 (Fla. 5th DCA 1981) (Rule 9.200(f)(2) was not intended to cure deficiencies resulting from the failure to make a record in the lower tribunal, but to give the parties the opportunity to have the appellate proceedings decided on the record before the lower tribunal) (citations omitted); <u>Seashole v. F & H of Jacksonville, Inc.</u>, 258 So. 2d 316 (Fla. 1st DCA 1972) (motion to supplement record would be denied where attached to it were affidavits and copies of correspondence and matters that had not been before trial court).  Additionally, Petitioner failed to show that the "Amended/Second" motion was ten pages in length when it was mailed from the correctional institution.  Indeed, Respondent notes, Petitioner never provided a copy of this alleged tenth "oath page" to the state courts, nor has he provided it to this court.  Therefore, Petitioner has failed to establish that the state courts caused him to procedurally default the claims asserted in his "Amended/Second" Rule 3.850 motion.

Petitioner also failed to show he is entitled to review of his claims through any other recognized exception to the procedural bar.  The court notes that in Ground Seven of the instant federal petition, Petitioner alleges the existence of newly discovered evidence that demonstrates his actual innocence of the murder (doc. 1 at 11–13).  The court will therefore determine whether Petitioner is entitled to review of his procedurally defaulted claims (Grounds Three, Four, Five, and Six) through the miscarriage of justice exception to the procedural bar.  As previously discussed, to qualify for this exception, Petitioner must show that "a constitutional violation has probably resulted in the conviction of one who is actually innocent."  <u>Schlup</u>, 513 U.S. at 327.  "To establish the requisite probability, the petitioner must show that it is more likely than not that no reasonable juror would have convicted him."  *Id.*  Further:

> a substantial claim that constitutional error has caused the conviction of an innocent person is extremely rare.  To be credible, such a claim requires [a] petitioner to support his allegations of constitutional error with new reliable evidence—whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence—that was not presented at trial.

*Id.*  The court's function is not to make an independent factual determination about what likely occurred, but rather to assess the likely impact of the evidence on reasonable jurors.  *Id.* at 329.  The Schlup standard is demanding and permits review only in the "extraordinary" case.  *Id.* at 327 (quotation omitted).  At the same time, though, the Schlup standard does not require absolute certainty about Petitioner's guilt or innocence.  "A petitioner's burden at the gateway stage is to demonstrate that more likely than not, in light of the new evidence, no reasonable juror would find him guilty beyond a reasonable doubt—or, to remove the double negative, that more likely than not any reasonable juror would have reasonable doubt."  House v. Bell, 547 U.S. 518, 538, 126 S. Ct. 20264, 165 L. Ed. 2d 1 (2006).

The allegedly new evidence in the instant case is an affidavit of Petitioner's sister, Carletha Purifoy, executed June 28, 2008 (*see* doc. 1 at 12).  In her affidavit, Ms. Purifoy states she is the former girlfriend of Garren Smith, who murdered Dean Perry, the victim in this case (Ex. XX at 42).  Ms. Purifoy states Garren Smith was a "big time drug dealer," who was feared by many people, including herself (*id.*).  She states he bragged to her that he had murdered many people (*id.*).  Purifoy states Garren Smith came home angry at Dean Perry for telling others where he (Smith) and Purifoy lived (*id.*).  Purifoy states Smith was angry, because Perry's disclosing the information placed their home in jeopardy of being robbed, and placed her and Smith in danger of being killed due to the large sums of money, drugs, and guns in their home (*id.*).  Purifoy states Garren Smith told her Dean Perry was a "dead man walking," and he was going to kill him (*id.*).  She states Smith said he was going to "set up" the killing to look like an accident (*id.*).  Purifoy states Garren Smith asked Petitioner to poison Dean Perry by putting boric acid in cocaine, but Petitioner refused (*id.*).  Purifoy states one night in October of 2003, Garren had a few friends at their home, including "Big Pope" and "Lil Pope" (*id.* at 43).  She states Garren drove off with the Popes and told her he would be right back (*id.*).  Purifoy states Garren was wearing a black jersey and black tennis shoes (*id.* at 43–44).  She states much later, she was awakened by a telephone call from Garren stating, "It's done.  Dean

is dead." (*id.* at 43).  She states Garren instructed her to follow Lil Pope, and he would bring her to

him (*id.*).  Purifoy states she followed Lil Pope to a motel and waited for Garren (*id.*).  Garren

arrived shirtless and barefoot with Big Pope (*id.*).  She states they drove back to their home and saw

a card from the Pensacola Police Department on the door, so Garren decided they had to move (*id.*

at 44).  She states the following morning, Petitioner called her and said the police were looking for

him (Petitioner) (*id.*).  She told Petitioner to take a cab to the Rodeway Inn (*id.*).  Purifoy states

Garren had told her police were looking for a white car and white men for questioning (*id.*).  She

states Petitioner and Big Pope drove white cars, and the Pope brothers resembled white men, but

they were black (*id.*).  Ms. Purifoy states she told Garren she needed to help Petitioner, but he did

not want to see or help Petitioner (*id.*).  She states Garren finally agreed to go with her to meet

Petitioner, but he told her to frisk Petitioner when she made contact with him (*id.*).  She states she

begged Garren to give her some money to help Petitioner, and he finally gave her a stack of bills

(*id.*).  Ms. Purifoy states she gave Petitioner the money and told him to go to Mobile, Alabama, and

she would meet him there (*id.*).  She then picked up Garren and they met Petitioner in Mobile (*id.*).

Petitioner got in their vehicle, and Purifoy drove toward Mississippi (*id.*).  During the ride, Purifoy

tried to get Garren to talk about Dean Perry, but he would not (*id.*).  She states Garren "drilled"

Petitioner during the ride, making sure Petitioner said what he (Garren) wanted him to say (*id.*).

Purifoy wondered to herself how Garren could know so much about the murder if he had not been

there (*id.*).  Upon their arrival in Mississippi, Petitioner got on a bus (*id.*).  Purifoy states Garren

promised to take care of Petitioner while he was on the run (*id.* at 45).  She states when she returned

to Pensacola, she contacted Detective Goss and briefly talked to him about Petitioner (*id.*).  She

states she told Goss about Garren's "evil ways" and said she had to leave town to care for a friend

(*id.*).  Purifoy states Garren made her quit her jobs and then forced her to flee with him to Georgia,

Louisiana, and Texas (*id.*).

    Ms. Purifoy states she was arrested on July 21, 2004 and detained at the Escambia County

Jail (*id.* at 45).  She states Detective Goss visited her at the jail and told her he could not "pin"

Garren for the murder, because he did not have enough evidence, but he knew Garren pulled the

trigger and Petitioner "just got caught up" (*id.*).  Goss also allegedly told her, "the streets say Garren

did it" (*id.*).  Purifoy states she told her defense attorney and "the State" what she knew and that she

was willing to testify (*id.*).  She states she was in jail from July 21, 2004 to September 28, 2005, but no one questioned her about Dean Perry's murder (*id.*).  She states she had no involvement in Perry's death (*id.*).  She states her opinion that the wrong man was convicted of Perry's death (*id.* at 46).

In determining what, if any, effect Ms. Purifoy's testimony would have had on the jury's decision, a review of the evidence admitted at trial is required.  Marya Hill, Dean Perry's sister, testified she saw Petitioner at Dean's house at 10:55 or 11:00 p.m. on the night of October 25, 2003 (Ex. D at 143–44).  She testified Petitioner was wearing a striped, long-sleeved shirt (*id.* at 144).

Robert Ouellette testified he was working at the Circle K store on Cervantes Street, where Cervantes turns into Scenic Highway, on the night of October 25, 2003 (Ex. D at 149).  He testified he started work at 11:00 p.m. that night (*id.*).  He stated two black men came into the store and purchased flashlight batteries (*id.* at 150).  He identified Petitioner in the courtroom as the man who paid for the batteries that night (*id.*).  Mr. Ouellette testified Petitioner acted nervous that night, because he dropped a hand full of change but did not bother to pick it up (*id.* at 150–51).  Mr. Ouellette identified a photograph from the store's surveillance camera (*id.* at 151).  He testified he recognized the man in the photograph as Petitioner (*id.*).

Mark Holmes, a police officer with the Pensacola Police Department, testified he was dispatched to the boardwalk at the bluffs on Scenic Highway at 12:23 a.m. on October 26, 2003, in reference to a dead person (Ex. D at 125).

Detective Eric Goss testified that shortly after midnight on October 26, 2003, he responded to a report of a dead person on the boardwalk of the bluffs on Scenic Highway in Pensacola (Ex. D at 180).  Later that day, Goss went to the home of Felicia Davis and observed a white Camaro owned by Petitioner backed up to a fence on the far side of the lot (*id.* at 181–83).  He made contact with Ms. Davis, and she escorted Goss to Petitioner's car and pointed to an area of bushes behind the car and said she saw Petitioner throw a gun there (*id.* at 183).  Goss testified he recovered the gun and gave it to Carolyn Stephens, a crime scene officer (*id.* at 183–84).  He testified that after speaking with Ms. Davis and the victim's sister, Marya Hill, he prepared an arrest warrant for Petitioner's arrest for Dean Perry's murder (*id.* at 185).

Sergeant Trotter testified he worked for the Cumberland County Sheriff's Office in North Carolina (Ex. D at 166). He testified Petitioner was arrested in his jurisdiction on November 5, 2003 (*id.* at 167). Trotter testified he interview Petitioner on November 7, 2003, during which Petitioner stated his sister, Carletha Purifoy, and her boyfriend, "Black," asked him to kill Dean Perry by mixing poison with powder and getting Perry to sniff it (*id.* at 168). Petitioner told Trotter he refused to do it, but he agree to beat up Perry or "set him up" to be beaten (*id.*). Petitioner told Trotter he picked up Dean Perry in his (Petitioner's) white Camaro, and they went to a Circle K near Scenic Highway and Cervantes (*id.* at 168–69). Trotter testified Petitioner told him he and Perry bought batteries and a flashlight, and drove to the bluffs (*id.* at 169). Petitioner told Trotter he dropped off Perry at the bluffs between 11:30 p.m. and 12:15 a.m., and that was the last time he saw him (*id.*). Petitioner told Trotter he heard about Perry's murder the next morning, and he went to his sister's house (*id.* at 169–70). Petitioner told Trotter his sister gave him $1,000.00, and he bought a bus ticket to North Carolina (*id.* at 170). Petitioner told Trotter he had previously owned a .357 magnum that he acquired from "Black," but he gave the gun back to "Black" a few weeks before Perry's murder (*id.* at 171).

Detective Goss testified he was notified by authorities in North Carolina that Petitioner had been arrested, so he and Investigator Sanderson went to North Carolina (*id.* at 185–86). He testified that when they arrived in North Carolina, Petitioner was being interviewed by Sergeant Trotter (*id.* at 186). He testified he and Sanderson entered the interview room, and Trotter introduced them to Petitioner (*id.*). Goss testified Petitioner first denied involvement in the murder and stated his sister actually wanted Dean Perry dead (*id.* at 187, 203). Petitioner also told Goss that his sister wanted him to kill Perry, and she suggested that Petitioner put poison in Perry's cocaine (*id.* at 187, 204). Petitioner told Goss that he told his sister he would not poison Perry (*id.*). Goss said Petitioner then told him his sister wanted Dean Perry beaten up, and he agreed to beat him up, but his sister was still trying to get Petitioner to poison Perry (*id.* at 187–88). Petitioner told Goss he and Perry were driving around the night of Perry's murder, and they went to a Circle K and then Petitioner dropped off Perry at the bluffs (*id.* at 188). Goss testified he asked Petitioner about a .357 magnum pistol, and Petitioner said he last saw the gun a week prior to Perry's murder, when he sold it to "Black" (Garren Smith) (*id.*). Detective Goss testified he told Petitioner he found the gun at Felicia Davis's

house behind Petitioner's car, and he found a striped shirt Petitioner was observed wearing at the Circle K that night (*id.* at 189). Goss testified he also suggested to Petitioner that Petitioner accidentally shot Dean Perry (*id.* at 189–90). Goss testified Petitioner changed his story and said he was at the bluffs with Perry when his (Petitioner's) sister and "Black" showed up (*id.* at 190). Petitioner told Goss he was walking up the stairs and heard a gunshot, and then saw "Black" run past him (*id.* at 190–91). Petitioner also told Goss he went to Felicia Davis's house after the shooting (*id.* at 191). Goss testified he asked Petitioner why he threw the gun in the bushes, and Petitioner responded he was scared (*id.*). Goss testified he continued to press Petitioner about Petitioner being the actual shooter, and Petitioner eventually stated the gun misfired while he was holding it (*id.* at 192). Petitioner told Goss he and Perry were walking down a stairway at the bluffs, and Perry was ahead of him (*id.* at 193). Petitioner told Goss he pulled the gun out of his waistband, brought it up to fire it in the air, and it misfired and hit Perry in the back of the head (*id.*). Goss testified Petitioner demonstrated how it happened (*id.* at 193–94). Petitioner told Goss the gun was loaded, and after it went off, he opened the cylinder of the gun and the other bullets fell out onto the boardwalk (*id.* at 196, 207). Detective Goss testified that no bullets were found at the boardwalk (*id.* at 197). Petitioner maintained his story that his sister and "Black" wanted Dean Perry dead (*id.* at 194, 203). Goss asked Petitioner why his sister and "Black" gave him a large amount of money, and Petitioner responded that they gave him $1,000.00 to get him out of town (*id.* at 194, 196). Goss asked Petitioner why they (his sister and "Black") wanted Dean Perry dead, and Petitioner responded that "Black" was a big dope dealer in town, and Dean was "running his mouth" about "Black" (*id.* at 195). Petitioner told Goss he was afraid that Carletha and "Black" were going to "do something" to him, and he (Petitioner) did not believe the police could protect him (*id.* at 198). Petitioner stated he did not want to be involved in it, but "they" involved him in it (*id.* at 200). He asked Goss, "how are you going to get them and protect me?" (*id.*). He stated, "They'll kill me. They'll disappear and pin it on me." (*id.* at 201). Petitioner told Goss he and Perry had bought a flashlight at a Circle K on Cervantes Street earlier that evening (*id.*). Petitioner also told Goss that Perry was lying face down after he shot him, and he (Petitioner) ran to Felicia Davis's house after he shot Perry (*id.* at 195–96). Petitioner told Goss he then called his sister (*id.* at 196).

Detective Goss testified he interviewed Carletha and "Black" (Ex. D at 207).  He testified neither of them told him anything that he could use against them (*id.*).  He stated he did not have enough evidence to charge either of them with Dean Perry's murder (*id.*).

Andrea Minyard, the chief medical examiner for Escambia County, testified she performed an autopsy on Dean Perry's body (Ex. D at 238–39).  She testified she observed a gunshot wound to the back of Mr. Perry's head and recovered a bullet from inside his head (*id.* at 240).  She gave the bullet to a crime scene officer, Nicole Heintzelman (*id.*).  Minyard testified Mr. Perry's death was caused by the gunshot wound (*id.* at 241).

Carolyn Stephens, a crime scene investigator, testified that no bullets were recovered from the crime scene (Ex. D at 209–10).  She testified she received a Smith & Wesson .357 magnum revolver from Detective Goss and placed it in a sealed box to be sent to the Florida Department of Law Enforcement ("FDLE") (*id.* at 211).  Nicole Heintzelman, also a crime scene analyst, testified she received a bullet from Dr. Minyard during Mr. Perry's autopsy and placed it in a sealed package to be sent to the FDLE (*id.* at 213–14).  She testified she also received samples of Mr. Perry's blood and forwarded those to the FDLE as well (*id.* at 215).

Michael Watkins, a crime scene analyst, testified that when he arrived at the murder scene, he found a yellow Dorcy brand flashlight on the ground just east of Mr. Perry's body, and the flashlight was still shining (Ex. D at 129–30).  He testified he did not find any bullets at the scene (*id.* at 131).  Watkins testified he examined Petitioner's white Camaro automobile and found a yellow Dorcy brand flashlight in the car (*id.* at 132).  He also found two empty battery packages and a striped shirt (*id.* at 132–33).  He testified he viewed video from a surveillance camera from a Circle K store and observed that an individual in the video was wearing what appeared to be the same shirt he recovered from Petitioner's car (*id.* at 133–34).  Watkins testified he recovered one expended shell casing from the gun found in the bushes at Felicia Davis's house, and the rest of the chambers were empty (*id.* at 135).

Douglas Rawls, a forensic firearms examiner, testified he examined the Smith & Wesson .357 magnum revolver recovered from the bushes at Felicia Davis's house near Petitioner's car, the .357 magnum caliber expended shell casing, and the bullet removed from Dean Perry's body, and

determined that the shell casing and the bullet were fired from the revolver found near Petitioner's car (Ex. D at 216–19).

Magda Clanton, a crime lab analyst supervisor, testified she analyzed a bloodstain found on the striped shirt recovered from Petitioner's car with a sample of Dean Perry's blood, and the two matched (Ex. D at 228–34).

Petitioner alleges Carletha Purifoy's affidavit "tends to demonstrate" his actual innocence of the crime (doc. 1 at 13).  He argues if the jury had heard Purifoy's testimony, no reasonable juror would have accepted the State's theory of premeditation, that Petitioner was paid $1,000.00 to murder Dean Perry (*id.*).  However, the jury heard evidence, through Petitioner's statements to Goss, that the purpose of the $1,000.00 payment was to "get out of town," not as payment for murdering Perry.  Further, Purifoy's testimony would not have undermined the State's other evidence of premeditation, including evidence that "Black" wanted Petitioner to kill Perry, Petitioner refused to poison Perry but agreed to beat him up, Petitioner bought a flashlight prior to taking Perry to the bluffs, and Petitioner had a gun in his waistband that he pulled out as he and Perry were walking down a stairway at the bluffs.

Additionally, to the extent Petitioner argues Purifoy's testimony would have shown he was framed for the murder, he has not shown that her testimony would have caused any reasonable juror to have reasonable doubt about his guilt.  The jury heard Petitioner's admission to Detective Goss that he took a gun and Perry to the bluffs, and there he shot Perry.  Additionally, Purifoy's affidavit does not suggest she was a witness to the murder, nor does it suggest she heard Garren Smith state he killed Perry.  Ms. Purifoy merely states Garren "Black" Smith wanted Perry dead, he wanted Petitioner to commit the murder, he was not at home when the murder occurred, he knew about the murder immediately after it happened, he helped Petitioner leave town and gave him money to do so, and he coached Petitioner about what to say when questioned about the killing.  Although Purifoy's information may have supported a charge against Garren "Black" Smith relating to Dean Perry's murder, her statements do not suggest Petitioner was actually innocent of the murder.

Petitioner failed to demonstrate that more likely than not any reasonable juror would have reasonable doubt at to his guilt had Ms. Purifoy testified consistently with her affidavit.  Therefore, he has failed to make a colorable showing of actual innocence.  Accordingly, he is not entitled to

review of his procedurally barred claims through the miscarriage of justice exception to the procedural bar.

> D.    Ground Seven:   "Newly discovered evidence of a Fourteenth Amendment due process Brady violation demonstrating Petitioner's actual innocence was denied by the state court on an unreasonable application of U.S. Supreme Court precedent."

In this ground, Petitioner asserts a violation of Brady v. Maryland, 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963) with respect to the State's failure to disclose to the defense that Carletha Purifoy, Petitioner's sister, could provide exculpatory testimony (doc. 1 at 11–13). Petitioner states Purifoy was forced by Garren "Black" Smith to leave the State after Dean Perry's death, so the State could not contact her to testify before the grand jury (id. at 12).  He states Purifoy was arrested on July 21, 2004, and detained at the Escambia County Jail (id.).  He states Detective Goss interviewed Purifoy at the jail, but the State never disclosed Ms. Purifoy or "Black" as potential witnesses in any discovery material, although the prosecutor argued at Petitioner's trial that Purifoy and "Black" paid Petitioner $1,000.00 to murder Perry (id.).  Petitioner asserts neither he nor defense counsel knew of Ms. Purifoy's whereabouts, and Detective Goss failed to disclose that she was at the jail (id.).  Further, since the State did not disclose Ms. Purifoy in any discovery materials, defense counsel had no reason to believe she had any information beyond what Petitioner was aware of (id. at 12–13).

Respondent states Petitioner presented this claim to the state court in his Rule 3.850 motion alleging newly discovered evidence, filed July 3, 2008 (doc. 22 at 53).  Respondent states the state circuit court dismissed the motion with prejudice and without adjudicating the merits of the Brady claim, on the ground that the motion was barred as successive under rule 3.850(f) (id. at 54–55). Respondent contends the court determined that Ms. Purifoy's affidavit did not qualify as newly discovered information, and Petitioner failed to show he could not have presented the claim in his first Rule 3.850 motion filed in 2007 that was adjudicated on the merits on June 13, 2007 (id. at 54–55).  Respondent asserts the First DCA affirmed the state circuit court's determination that the motion was impermissibly successive (id. at 56).  Therefore, the Brady claim is procedurally barred from federal review (id. at 56–59).

The state court record demonstrates Petitioner raised this claim in his Rule 3.850 motion filed July 3, 2008 (Ex. XX).  The state circuit court found as fact that Petitioner was aware at the time of his trial of his sister's potential testimony (Ex. ZZ at 84).  The court further found that Ms. Purifoy could have been called to testify by the defense regardless of whether she was listed as a witness by the State (*id.*).  The court found that Petitioner alleged no reason why his <u>Brady</u> claim could not have been brought in his previously filed Ruled 3.850 motion, which was denied on the merits on June 13, 2007 (*id.* at 85).  Based upon these findings, the court determined that the information presented by Petitioner did not qualify as newly discovered evidence; therefore, his motion was barred as successive under Rule 3.850(f) (*id.*).  The First DCA affirmed the decision without written opinion

Petitioner appears to argue that the state court's determination that Ms. Purifoy's affidavit did not qualify as newly discovered evidence constituted an adjudication on the merits for purposes of § 2254 (doc. 28 at 24).  He contends the court's application of the procedural bar was thus not an independent basis for dismissal of his motion (*id.*).  He also argues the state court's application of the procedural bar was arbitrary (*id.* at 252–29).  He insists he could not have known Ms. Purifoy's whereabouts unless the State disclosed it (*id.* at 25–28).  He argues Ms. Purifoy's testimony would have established that Garren Smith shot Dean Perry (*id.* at 25).  He argues no reasonable jury would have believed the State's theory of premeditation had they heard Purifoy's testimony (*id.* at 26).  Petitioner states he told the truth during his interview with Detective Goss, and he never confessed to shooting anyone (*id.*).

Rule 3.850(f) provides, in relevant part, that a second or successive motion may be dismissed "if new and different grounds are alleged, [and] the judge finds that the failure of the movant or the attorney to assert those grounds in a prior motion constituted an abuse of the procedure governed by these rules."  Fla. R. Crim. P. 3.850(f).  In the instant case, the state court determined the Rule 3.850 motion was barred by Rule 3.850(f), because Petitioner failed to show a sufficient justification for not raising his <u>Brady</u> claim in the prior Rule 3.850 motion that was adjudicated on the merits on June 13, 2007 (*see* Exs. S, Y).  This was a clear and express statement that the court was relying on a state procedural rule to resolve Petitioner's claim.  *See* <u>Ylst</u>, 501 U.S. at 803 (although a procedural bar may be removed if the last state court to be presented with a claim ignores the bar and reaches the merits, when the trial court's denial of a claim on procedural grounds is affirmed

by the appellate court per curiam and without opinion, the appellate decision is deemed to have affirmed the procedural bar).  Additionally, the state court's decision on the procedural issue rested entirely on state law grounds, namely, Rule 3.850(f), and this rule is firmly established and regularly followed by Florida courts.  *See* Fla. R. Crim. P. 3.850(f); *see also* <u>Frazier v. State</u>, 898 So. 2d 1183, 1183–84 (Fla. 3d DCA 2005) (barring as successive claims that could have and should have been made in previous post-conviction motion); <u>Washington v. State</u>, 876 So. 2d 1233, 1234 (Fla. 5th DCA 2004) (same).  Therefore Petitioner's <u>Brady</u> claim is procedurally barred from federal review unless he satisfies the "cause and prejudice" or "miscarriage of justice" exception to the procedural bar.

Petitioner failed to show he could not have obtained his sister's affidavit prior to August 30, 2006, the date he filed the Rule 3.850 motion that was adjudicated on the merits (*see* Ex. S).  Ms. Purifoy's affidavit reflects that when she executed it, she was an inmate of the Florida Department of Corrections, FDOC identification number J01145 (*see* Ex. XX at 46).  The records of the FDOC show Ms. Purifoy was initially received by the FDOC on September 28, 2005, which is the day Ms. Purifoy states was her last day at the Escambia County Jail.  Petitioner was obviously able to obtain Ms. Purifoy's affidavit within one month after she executed it, since her affidavit was executed June 18, 2008, and Petitioner filed it with the court on July 3, 2008 (*see* Ex. XX).  He has not alleged or shown that an external impediment prevented him from obtaining his sister's affidavit prior to filing his 2006 post-conviction motion.  Therefore, he failed to demonstrate cause for his procedural default.  Further, as previously discussed, he failed to show he qualifies for review under the fundamental miscarriage of justice exception to the procedural bar.  Therefore, he is not entitled to federal review of his <u>Brady</u> claim.

V.      CERTIFICATE OF APPEALABILITY

As amended effective December 1, 2009, § 2254 Rule 11(a) provides that "[t]he district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant," and if a certificate is issued "the court must state the specific issue or issues that satisfy the showing required by 28 U.S.C. § 2253(c)(2)."  A timely notice of appeal must still be filed, even if the court issues a certificate of appealability.  Rule 11(b), Rules Governing Section 2254 Cases.

The undersigned finds no substantial showing of the denial of a constitutional right.  28 U.S.C. § 2253(c)(2); Slack v. McDaniel, 529 U.S. 473, 483–84, 120 S. Ct. 1595, 1603–04, 146 L. Ed. 2d 542 (2000) (explaining how to satisfy this showing) (citation omitted).  Therefore, the undersigned recommends that the district court deny a certificate of appealability in its final order.

The second sentence of new Rule 11(a) provides:  "Before entering the final order, the court may direct the parties to submit arguments on whether a certificate should issue."  Thus, if there is an objection to this recommendation by either party, that party may bring this argument to the attention of the district judge in the objections permitted to this report and recommendation.

Accordingly, it is respectfully **RECOMMENDED**:

1.      That the petition for writ of habeas corpus (doc. 1) be **DENIED**.

2.      That a certificate of appealability be **DENIED**.

At Pensacola, Florida, this 27<u>th</u> day of October 2011.


/s/ Elizabeth M. Timothy
**ELIZABETH M.  TIMOTHY**
**UNITED STATES MAGISTRATE JUDGE**


<u>**NOTICE TO THE PARTIES**</u>

**Objections to these proposed findings and recommendations may be filed within fourteen (14) days after being served a copy thereof.  <u>Any different deadline that may appear on the electronic docket is for the court's internal use only, and does not control.</u>  A copy of objections shall be served upon the magistrate judge and all other parties.  Failure to object may limit the scope of appellate review of factual findings.  *See* 28 U.S.C. § 636; <u>United States v. Roberts</u>, 858 F.2d 698, 701 (11th Cir. 1988).**